UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION - FLINT

IN RE:

    CARRIE THOMPSON,                                         Case No. 08-34454-dof
                                                                Chapter 7 Proceeding
    Debtor.                                                             Hon. Daniel S. Opperman
_____/

JOY N. EBIG, Conservator for
JAY J. MCINTYRE,

    Plaintiff,

v.                                                                                  Adversary Proceeding
                                                                                  Case No. 09-3037-dof

CARRIE THOMPSON,

    Defendant.
_____/

## TRIAL OPINION

Plaintiff, Joy N. Ebig, as Conservator for Jay J. McIntyre, filed a Complaint to determine the dischargeability of an obligation owed by Defendant, Carrie Thompson. Defendant, Carrie Thompson, responded to Plaintiff's Complaint, and the Court conducted a Trial on this matter on November 17, 2009. For the reasons stated in this Opinion, the Court determines that a portion of the obligation owed by Ms. Thompson is excepted from discharge pursuant to 11 U.S.C. § 523.

### Findings of Fact

Jay McIntyre suffers from a mental disability that prompted the appointment of Ms. Ebig as his Conservator after the events described in this Opinion. For many years, Mr. McIntyre lived with his grandfather in a house located at 423 South Lincoln Street, Bay City, Michigan. Mr. McIntyre's grandfather died in 2004 and he inherited the Lincoln Street property, as well as monies from

1

various bank and brokerage accounts in Michigan. Shortly thereafter, Mr. McIntyre frequented Deja Vu, a men's entertainment club in Saginaw, Michigan. At Deja Vu, Mr. McIntyre first met Stacey Reed, who professed her immediate love for him and requested that Mr. McIntyre return her statement of love in the form of an engagement ring. Mr. McIntyre complied with Ms. Reed's request that day and the two of them agreed to marry. Mr. McIntyre purchased other items for Ms. Reed, including a horse, stabling for the horse, a hot tub, and other items of personal property. Shortly thereafter, Ms. Reed disclosed that she was already married, so the planned wedding between Mr. McIntyre and Ms. Reed did not go through. Mr. McIntyre continued to frequent Deja Vu and took advantage of the full range of services available at that establishment with a number of the dancers there.

Shortly after his breakup with Ms. Reed, Mr. McIntyre became more involved with the Defendant, Carrie Thompson. Ms. Thompson was a dancer at Deja Vu and, along with other dancers, spent a considerable amount of time with Mr. McIntyre either at the Deja Vu general facility or in the "VIP Lounge". Mr. McIntyre continued his habit of paying money to, and buying gifts for, Defendant and the other dancers while at Deja Vu.

As early as November, 2004, Ms. Thompson began receiving checks in a substantial amount of money from Mr. McIntyre. On November 17, 2004, Ms. Thompson received a check in the amount of $29,700.00 (Plaintiff's Exhibit 14), on December 8, 2004, she received a check in the amount of $10,000.00 (Plaintiff's Exhibit 15), and on December 10, 2004, she received a check in the amount of $18,137.70 (Plaintiff's Exhibit 16). Deposits of $29,700.00, $10,000.00, and $18,137.70 were made on November 22, 2004, and December 13, 2004, into Defendant's National City Bank account (Plaintiff's Exhibit 12). Each of these checks were written on Mr. McIntyre's

2

Edward Jones account and made payable to him. Each check was also endorsed by Mr. McIntyre and Ms. Thompson. The November and December, 2004, statements from Edward Jones reveal withdrawals totaling $41,400.00 in November, 2004, and $28,173.70 in December, 2004 (Plaintiff's Exhibit 18).

Mr. McIntyre and Ms. Thompson disagree as to the reason for these transfers. Mr. McIntyre testified that he gave Ms. Thompson these checks so that she would invest money for him at a better rate of interest. According to Mr. McIntyre's testimony, Ms. Thompson saw that he was spending a great deal of money at Deja Vu, inquired into where his money was invested, and suggested to him that he needed to have a better return on his money than that available at local financial institutions and brokerage firms, including Merrill Lynch and Edward Jones. Mr. McIntyre testified he gave Ms. Thompson this money so that she would invest it for him and he would receive a better rate of interest.

Ms. Thompson's testimony is completely different. Per Ms. Thompson, Mr. McIntyre gave this money to her as a series of gifts, which she testified was not uncommon for this type of relationship between a Deja Vu dancer and patron. Ms. Thompson's testimony about these three checks has varied over time. In her deposition that was taken on June 26, 2009, she initially disavowed receiving any checks from Mr. McIntyre and instead believed that the money she received into her account came from a person named Norm, another patron of Deja Vu (Plaintiff's Exhibit 21, pp. 89, 91-92). Subsequently in her deposition, however, Ms. Thompson, after seeing copies of the checks and other records, admitted receiving the checks (Plaintiff's Exhibit 21, pg. 100).

By December, 2004, Mr. McIntyre decided that he should hire a different realtor to sell the

3

Lincoln Street property. Accordingly, Mr. McIntyre hired Hollister Realtors to try to sell this property. During the course of one of his many discussions with Ms. Thompson, he told her of his desire to sell this property, and she suggested that he change realtors from Hollister Realtors to Young Realty. Mr. McIntyre acted on that suggestion and engaged Robert Young of Young Realty to sell the Lincoln Street property.

In February, 2005, Mr. McIntyre signed a Quit Claim Deed as a grantor granting a tenants-in-common interest to himself and Ms. Thompson. Mr. Young prepared this Deed, and it was duly recorded on March 21, 2006 (Plaintiff's Exhibit 14). Again, the circumstances surrounding this Deed are in dispute.

Mr. McIntyre testified that he signed this Deed as part of his investment strategy to protect him from substandard returns and from the demands of others, including the Deja Vu dancers and his own family members. Ms. Thompson testified that she initially was reluctant to have Mr. McIntyre place her name on this Deed and only agreed to do so as to protect him from the claims of family members and other Deja Vu dancers.

Shortly before Mr. McIntyre switched from Hollister Realtors to Young Realty, an offer of $90,000 was received as a result of the efforts of Hollister Realtors. Mr. McIntyre rejected this offer and instead listed the property with Young Realty. By May, 2005, Mr. McIntyre began requesting Ms. Thompson return the money that he had given to her. Ms. Thompson would from time to time give Mr. McIntyre some money back, but did tell Mr. McIntyre that another person at Deja Vu had gotten into her account and had taken the money that he had entrusted to her. By July, 2005, Young Realty had found a purchaser for the Lincoln Street property and had both Mr. McIntyre and Ms. Thompson sign a purchase agreement (Exhibit 8). The purchase price for the Lincoln Street

4

property was $94,900.00, but the estimated cash due to seller ranged anywhere from $67,267.00 (Plaintiff's Exhibit 9) to $79,311.00 (Plaintiff's Exhibit 11). The transaction closed July 25, 2005, and the settlement statement reflects cash to sellers of $79,311.51. Ms. Thompson testified that since Mr. McIntyre had significantly damaged the Lincoln Street home property, repairs were necessary. Accordingly, in order to pay for these repairs Mr. Young, Mr. McIntyre, and Ms. Thompson took the settlement check and cashed that check at National City Bank. Ms. Thompson testified that she gave Mr. Young sufficient money as required by the estimated closing costs to pay for the damage and deposited the remainder, $66,690.11, into her account there. On August 2, 2005, Ms. Thompson gave Mr. McIntyre $33,000.00 in cash and had him sign a receipt (Plaintiff's Exhibit 13). She gave Mr. McIntyre some money for the next month or so, but then terminated her relationship with Mr. McIntyre. During all of this time, Mr. McIntyre continued to frequent Deja Vu and spent money on many of the dancers there.

Ms. Ebig was appointed as receiver for Mr. McIntyre and initiated a number of actions against various parties, including Ms. Thompson. As a result of these actions, a Default Judgment was entered against Ms. Thompson on March 14, 2007, in the amount of $209,908.00. Ms. Thompson filed a Petition seeking relief under Chapter 7 of the Bankruptcy Code on October 28, 2008.

Statement of Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) (determinations as to the dischargeability of particular debts).

Analysis

Plaintiff's Complaint references 11 U.S.C. § 523(a)(2)(A), (4), and (6). These subsections state, in pertinent part, as follows:

> (a) A discharge under section 727 . . . does not discharge an individual debtor from any debt —
>
> > (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by —
> >
> > > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>
> * * * *
>
> > (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;
>
> * * * *
>
> > (6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

Section 523(a)(2)(A)

To prevail on a claim under 523(a)(2)(A), a plaintiff must show that:

> (1) [T]he debtor obtained money through a material misrepresentation that at the time the debtor knew was false or that he made with reckless disregard for the truth; (2) the debtor intended to deceive; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of loss.

*In re Rembert,* 141 F.3d 277, 280 (6th Cir. 1998). Whether a debtor possessed intent to deceive is measured by a subjective standard. *Id.*

The purpose of section 523(a)(2) is to prevent debtors from retaining the benefits of property obtained through fraud. *In re Omegas Group, Inc.*, 16 F.3d 1443, 1451 (6th Cir. 1994). Plaintiff

6

must show each element by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286 (1991). Even so, the court must construe all of the exceptions to discharge strictly, and must give the benefit of the doubt to debtor. *Rembert,* 141 F.3d at 281.

Intent, under *Rembert*, is measured subjectively. 141 F.3d at 281. A debtor intends to deceive a creditor "when the debtor makes a false representation which the debtor knows or should have known would induce another to advance goods or services to the debtor." *Bernard Lumber Co. v. Patrick (In re Patrick)*, 265 B.R. 913, 916 (Bankr. N.D. Ohio 2001). Fraudulent intent requires an actual intent to mislead, which is more than mere negligence. . . A 'dumb but honest' [debtor] does not satisfy the test." *Palmacci*, 121 F.3d at 788 (citations omitted). A debtor's fraudulent intent:

> may be inferred from the totality of the circumstances. The bankruptcy court must consider whether the totality of the circumstances' presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor.' The court may consider not only the debtor's conduct at the time of the representations, but may consider subsequent conduct, to the extent that it provides an indication of the debtor's state of mind at the time of the actionable representations.

*Wolf v. McGuire (In re McGuire)*, 284 B.R. 481, 492 (Bankr. D. Col. 2002)(quoting *Groetken v. Davis (In re Davis)*, 246 B.R. 646, 652 (10th Cir. BAP 2000)(citations omitted). "A creditor can present proof of surrounding circumstances from which a [c]ourt can infer a dishonest intent." *McCoy,* 299 B.R. at 199.

Section 523(a)(4)

Under 11 U.S.C. §523(a)(4), a debt will be determined nondischargeable if it is a debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." If "fraud or defalcation" is at issue, the Sixth Circuit has adopted a narrow definition of the requirement that the Debtor act in a "fiduciary capacity" under Section 523(a)(4) in the case of *R.E. America, Inc. v.*

7

*Garver (In re Garver)*, 116 F.3d 176, 179 (6th Cir. 1997), holding that the term "implies the existence of an express or technical trust relationship," requiring that "the debtor must hold funds in trust for a third party to satisfy the fiduciary relationship element of the defalcation provision of § 523(a)(4)."

The burden is on the plaintiff creditor to prove by a preponderance of the evidence that the debt should be excepted from discharge under Section 523(a)(4), and thus the creditor has the burden of proving the debtor is a "fiduciary." *See Grogan v. Garner*, 498 U.S. 279 (1991); *Meyers v. IRS (In re Meyers)*, 196 F.3d 622 (6th Cir. 1999).

In contrast to "fraud or defalcation," neither embezzlement nor larceny are conditioned upon the existence of an action taken in a "fiduciary capacity," and for Section 523(a)(4) purposes, federal common law, rather than state law, controls the meaning of these terms. *Brady v. McAllister (In re Brady)*, 101 F.3d 1165, 1172-73 (6th Cir. 1996). Federal common law defines embezzlement as "the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come." *Id*. Larceny is different in that the original taking must have been unlawful, and is defined as "the fraudulent and wrongful taking and carrying away of the property of another with intent to convert such property to the taker's use without the consent of the owner." *Graffice v. Grim (In re Grim)*, 293 B.R. 156, 166 (Bankr. N.D. Ohio 2003).

Section 523(a)(6) authorizes a bankruptcy court to exclude a debtor from receiving a discharge "from any debt for willful and malicious injury by the debtor to another entity or the property of another entity." The exceptions to discharge are to be narrowly construed in favor of the debtor. *Monsanto Co., v. Trantham (In re Trantham)*, 304 B.R. 298 (B.A.P. 6th Cir. 2004) (citing *Meyers v. I.R.S.*, 196 F.3d 622 (6th Cir. 1999)); *see also Walker v. Tuttle (In re Tuttle)*, 224 B.R.

8

606, 610 (Bankr. W.D. Mich. 1998) ("Courts will narrowly construe the language of § 523 to assure the debtor has an opportunity for a fresh start.") A party must prove by a preponderance of the evidence that a debtor committed an injury that is both willful <u>and</u> malicious. *Grogan v. Garner*, 498 U.S. 279 (1991).

Section 523(a)(6)

In the case of *Kennedy v. Mustaine (In re Kennedy)*, 249 F.3d 576, 581 (6th Cir. 2001), the Court of Appeals reiterated the previous holdings of the United States Supreme Court and the Sixth Circuit, and summarized the test under Section 523(a)(6) as: "[O]nly acts done with the intent to cause injury–and not merely acts done intentionally–rise to the level of willful and malicious injury for purposes of satisfying § 523(a)(6).". *Kawaauhau v. Geiger*, 523 U.S. 57 (1998); *Markowitz v. Campbell, (In re Markowitz)*, 190 F.3d 455 (6th Cir. 1999).

Initially, the Court notes that Plaintiff seeks to have the entire $209,908.00 Default Judgment amount determined to be excepted from discharge. Plaintiff has not provided the Court with any basis to rely upon this number as a valid basis for damages. As best as can be gleaned from the record, including counsel's opening statement and closing argument, this amount is the full amount that was held by Mr. McIntyre at one time or another.

The Court rejects a blanket determination that the entire Default Judgment of $209,908.00 should be excepted from the discharge of Ms. Thompson. First, the record does not give the Court any basis whatsoever to determine the method used to reach this amount. Second, the testimony from both witnesses clearly establishes that Mr. McIntyre parted with a substantial amount of money either directly at Deja Vu for the myriad of services available there or in the form of gifts given to others. By way of example, Mr. McIntyre frequented the VIP Lounge at Deja Vu at the rate of

9

$300.00 per hour. Although there is nothing in the record to indicate that Mr. McIntyre spent approximately 700 hours at this Lounge, the record is also clear that Mr. McIntyre spent more than just one or two hours at the VIP Lounge. With this record, the Court cannot conclude that the entire $209,908.00 stated in the Default Judgment constitutes the amount of money that Mr. McIntyre gave Ms. Thompson.

What is established very clearly, however, is that Defendant received three checks totaling $57,837.70, as well as the proceeds from the Lincoln Street property. The Court will take each of these two asset classes in order.

In weighing the testimony of Mr. McIntyre and Ms. Thompson, the Court concludes that Mr. McIntyre lacks the basic mental capacity to differentiate between idle talk and substantive promises. As an example, most logical individuals would not purchase an engagement ring for someone within hours of meeting that individual, especially under the circumstances as Mr. McIntyre did in regard to Ms. Reed. Also, the Court witnessed the testimony of Mr. McIntyre and finds that his demeanor, especially when answering certain questions, clearly demonstrates that he lacks certain mental capabilities to distinguish between empty and meaningful promises.

In contrast, Ms. Thompson appears very aware and knowledgeable of her circumstances and of what she is saying. After making that conclusion, the Court finds that Ms. Thompson's statements and behavior supports a determination that the $57,837.70 received by her is excepted from discharge. First, Ms. Thompson, in her deposition testimony, originally denied receiving any checks from Mr. McIntyre. It was not until she was confronted with proof of her signature on the checks, coupled with proof of deposit of the checks, that she conceded receipt of these monies. This course of action is inconsistent with the receipt of a series of gifts in a substantial amount. It is much

10

more likely that Ms. Thompson did improperly entice Mr. McIntyre with promises of greater returns, even though that statement would be seen as false by a majority of individuals. Second, Mr. McIntyre started requesting the return of some of this money as early as May, 2004. Ms. Thompson's response was to return some money, but then tell him that another Deja Vu dancer had taken the money from her account. If the checks were gifts, as claimed by Ms. Thompson, the partial return of the money is inconsistent with this claim, as is the later explanation for the disappearance of the money.

Overall, in regard to the $57,837.70, the Court concludes that Plaintiff has proven by a preponderance of the evidence that Ms. Thompson obtained the $57,837.70 from Mr. McIntyre: (1) through known false representations or at a minimum, such representations were made with a reckless disregard for the truth; (2) which, under the above-described totality of the circumstances were intended to deceive Mr. McIntyre; (3) which representations Mr. McIntyre justifiably relied upon; and (4) such reliance was the proximate cause of Mr. McIntyre's loss of the $57,837.70. Thus, the $57,837.70 received by Ms. Thompson from Mr. McIntyre is excepted from discharge under 11 U.S.C. § 523(a)(2)(A). As the Court finds this amount is excepted from discharge under Section 523(a)(2)(A), determinations under Sections 523(a)(4) and (a)(6) as to this amount are unnecessary.

In regard to the Lincoln Street property, the Court notes that the record is not as clear. First, Mr. McIntyre did not outright transfer the property to Ms. Thompson, but instead executed a Quit Claim Deed naming her as a co-tenant. Second, the switch from Hollister Realtors to Young Realty at least netted a greater offer price of $94,900.00 as opposed to the $90,000.00 procured by Hollister Realtors. On the other hand, it appears that the gross proceeds were significantly reduced to

11

approximately $66,690.11, either because of damage to the Lincoln Street property by Mr. McIntyre or by improper conduct of others. It is also clear from the record that Ms. Thompson withdrew at least $33,000.00 from her account and procured a signed receipt from Mr. McIntyre evidencing receipt of $33,000.00 in cash.

With this mixed factual record, the Court turns to the review of the burden of proof by a preponderance of the evidence in cases such as this. Initially, Plaintiff has the burden of proving the case in chief. Here, the Court concludes that Plaintiff did not sufficiently prove that Ms. Thompson intended to defraud or make false statements to Mr. McIntyre with regard to the Lincoln Street property proceeds. In particular, the mere addition of Ms. Thompson to the title of the Lincoln Street property, as opposed to the outright transfer of the house, is indicative of a gift, especially under the circumstances of the possibility, however remote, that Ms. Thompson and Mr. McIntyre would possibly be together as a couple. Unlike the receipt of the checks, Ms. Thompson's statements are consistent in regard to the house. Moreover, the evidence supports the finding and conclusion that Ms. Thompson withdrew $33,000.00 from her account and gave that money to Mr. McIntyre. Finally, even an individual with Mr. McIntyre's mental capacity should have known by July, 2005, that Ms. Thompson was not a good investor. By that date, she told Mr. McIntyre that she no longer had the $57,837.70 entrusted to her by him. The Court cannot conclude, by a preponderance of the evidence, that Ms. Thompson made such false statements to Mr. McIntyre to induce him to either sign the Quit Claim Deed, or that she did not give Mr. McIntyre his proper interest in the Lincoln Street property proceeds. Likewise, based upon this analysis and the Court's conclusions, the Court concludes that any debt related to the Lincoln Street property is dischargeable under 11 U.S.C. § 523(a)(4), as Ms. Thompson was not acting in the required fiduciary capacity, and

did not engage in conduct amounting to embezzlement or larceny. Further, Ms. Thompson's actions regarding the Lincoln Street property did not rise to the level of willful and malicious conduct so as to be non-dischargeable under 11 U.S.C. § 523(a)(6).

Accordingly, the Court concludes that the amount of $57,837.70 is excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A). The remaining amounts owed by Defendant, Carrie Thompson, are discharged.

The Court will prepare an appropriate Order.

cc:  Carrie Thompson
     Martin Wilson

**Signed on March 17, 2010**

>          **/s/ Daniel S. Opperman**
>     **Daniel S. Opperman**
>     **United States Bankruptcy Judge**